The source of your deponent's information and the grounds for his belief are as follows:[1/]

1.    I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for over two years.  I am currently assigned to an FBI squad that investigates public corruption.  During my tenure with the FBI, I have participated in investigations that have included, among other investigative techniques, the use of physical surveillance, execution of search warrants, consensual recordings of individuals and debriefing of confidential sources and cooperating witnesses.  Through my training, education and experience, I have become familiar with the activities of those who traffic in fraudulent identification documents and the efforts of persons involved in such activity to avoid detection by law enforcement.

2.    I have participated in the investigation of the offenses described herein.  As a result of my participation in this investigation, and through interviews with, and analysis of reports submitted by other law enforcement personnel, I am familiar with this investigation.  The statements contained in this affidavit are based in part on information provided by Special Agents of the FBI, other law enforcement personnel, confidential informants, and are also based on my experience and background as a Special Agent.  All statements are provided in sum and substance and in part unless otherwise specified.

---

[1/] Because the purpose of this Complaint is to establish only probable cause to arrest, I have not set forth a description of all the facts and circumstances of which I am aware.

3.    On or about August 1, 2009, the defendant, STAN GERALD MAYNARD, also known as "Abdaziz," called an individual who later became a confidential source with the FBI, (the "CS"), and asked the CS[2] if s/he was interested in purchasing false identification documents.  I have listened to a recording the CS made of this telephone call.  In subsequent telephone calls made from August to February 2009,[3] MAYNARD clarified that he could sell fraudulent birth certificates, social security cards and state identification documents to the CS.  Over the course of these telephone calls, the CS stated to MAYNARD that s/he had acquaintances who were interested in purchasing such documents. In response, MAYNARD told the CS that he would need color photographs and identifying information for these acquaintances in order to produce the fraudulent documents.  MAYNARD additionally told the CS that he had contacts within the governmental agencies that produce such documents and assured the CS that the documents will appear to be genuine.

---

[2]    The CS has pleaded guilty to an unrelated crime in the Eastern District of New York for which s/he received a custodial sentence.  The CS's surrender date was stayed so that s/he could cooperate in the instant investigation.  The government has not entered into any agreement with the CS.  However, the CS is cooperating in the hopes of reducing his/her sentence through a Rule 35 letter.  The CS has previously provided information in other jurisdictions that has proven reliable and the information s/he provided in this case has been corroborated by consensual recordings s/he made at my direction.

[3]  These telephone calls did not occur at the direction of any law enforcement agency as I had not met the CS at this point and an investigation of MAYNARD had not yet begun.  The CS, however, recorded each of these conversations on his/her own and I have listened to these recordings.

4.    Or about March 8, 2010, under the supervision of law enforcement agents, the CS met MAYNARD at a restaurant in New Jersey.  Prior to the meeting, law enforcement agents provided the CS with photographs and biographical information for "Mohammed Fayez Fayed," a fictitious individual who the CS was to tell MAYNARD wanted to purchase fraudulent identification documents.  At the meeting, the CS provided MAYNARD with these materials and told MAYNARD that a friend, "Mohammed Fayez Fayed," was interested in purchasing fraudulent identification documents.  MAYNARD stated that he would try to procure fraudulent identification documents on this individual's behalf.

5.    On or about March 15, 2010, under the supervision of law enforcement agents, the CS, who was wearing a recording device, met MAYNARD at a parking lot in New Jersey.  MAYNARD told the CS he could provide "Mohammed Fayez Fayed" with a fraudulent birth certificate and social security card for $12,000.  MAYNARD also stated that he could produce those documents in short order and that, with additional time, he could also procure a fraudulent driver's license.

6.    In the weeks following the March 15, 2010 meeting, MAYNARD and the CS spoke on telephone numerous times about the possibility of procuring the fraudulent identification documents for "Mohammed Fayez Fayed" as well another individual.  During

4

these recorded telephone calls, MAYNARD reiterated to the CS that if the CS, on his/her friend's behalf, provided him with a down-payment, it would result in a more timely production of the identification documents.

7.    On or about May 10, 2010, the CS telephoned MAYNARD and told him that s/he had spoken to "Mohammed Fayez Fayed" and that this individual was ready to make a payment of $10,000 in furtherance of procuring the false identification documents discussed previously.  The CS and MAYNARD agreed to meet the following day at a Burger King at Brooklyn, New York where the CS was to give MAYNARD the currency.

8.    On or about May 11, 2010, I met with the CS in Brooklyn, New York.  I gave the CS $10,000 in United States currency for which I had previously recorded the serial numbers of the bills by photocopying those bills.  A fellow enforcement officer told me that he surveilled the CS as the CS met with MAYNARD at the designated Burger King in Brooklyn, and that this officer observed the CS give the prerecorded bills to MAYNARD. At the conclusion of the meeting, MAYNARD was arrested and found to be in possession of the prerecorded bills.

9.    Following his arrest, MAYNARD waived his Miranda rights and agreed to speak with me as well as fellow agents. MAYNARD admitted that he had accepted the money from the CS in exchange for his help in procuring fraudulent identification

5

documents.  He also stated, however, that he was merely acting as a middleman and did not have a personal connection with the individuals who produced the fraudulent documents.  He further stated that the individual who did have the personal connection with the document producers, and the person to whom he was to provide the $10,000, was an individual named "Rumi."  MAYNARD agreed to work with the government to gather evidence against "Rumi."

10.  Following his arrest, in an attempt to learn "Rumi's" identity, fellow agents and I drove with MAYNARD to an address located in Queens, New York that MAYNARD stated was the location where "Rumi" resided.  In front of this location was a vehicle that MAYNARD stated belonged to "Rumi."  An FBI employee, accessing the New York State Department of Motor Vehicles database, learned that the vehicle was registered to defendant GHULAM MESBAHUDDIN.

11.  On or about May 11, 2010, shortly after his arrest, and in my presence, MAYNARD telephoned "Rumi," and told him he was in possession of $10,000 and that he wanted to provide it to "Rumi" and arrange for the procurement of the fraudulent identification documents.  In a telephone call a short time later, the two agreed to meet at a restaurant in Queens, New York, where MAYNARD was to give the currency and the other materials to "Rumi."

6

12.  Prior to the meeting with "Rumi," fellow agents and I escorted MAYNARD to his apartment, and, with his consent, retrieved the photographs and biographical information for "Mohammed Fayez Fayed" that the CS had originally provided to him.  These materials had been kept in an envelope that had the words "To Rumi from Abdaziz" written on the front.  I then provided MAYNARD with that envelope along with the $10,000 he was arrested with earlier that day, and drove him to the location of the meeting in Queens, New York.

13.  At the meeting between MAYNARD and "Rumi" on or about May 11, 2010, a fellow law enforcement officer observed MAYNARD give the envelope as well as the prerecorded currency to "Rumi."  At the conclusion of the meeting, "Rumi" was arrested and found to be in possession of the package and prerecorded bills.  This individual was also found to be in possession of a driver's license bearing the name "GHULAM MESBAHUDDIN," which confirmed that "Rumi" was an alias for the defendant Ghulam MESBAHUDDIN.

14.  After MAYNARD's meeting on or about May 11, 2010 with the defendant GHULAM MESBAHUDDIN, I spoke with the MAYNARD. Based on that conversation, I learned that MAYNARD gave MESBAHUDDIN the $10,000 in United States currency, as well as the photographs and information concerning "Mohammed Fayez Fayed" and that MESBAHUDDIN agreed to provide MAYNARD with a false social

7

security card, work permit and driver's license for "Mohammed Fayez Fayed" at a future date.

15.   WHEREFORE, your deponent respectfully requests that the defendants STAN GERALD MAYNARD, also known as "Abdaziz," and GHULAM MESBAHUDDIN, also known as "Rumi," be dealt with according to law.

_____
Ryan P. Stinson
Special Agent
FBI

Sworn to before me this
12th day of May, 2010

_____
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK